**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **S.J., a minor, by and through Ebonie Jude, as next friend of S.J.** | ) ) ) | |
| **Plaintiff,** | ) ) | **No.** |
| **v.** | ) ) ) | **JURY TRIAL DEMANDED** |
| **Board of Education of the City of Chicago, a/k/a Chicago Public Schools, District 299, and Macquline King, in her Official Capacity as Chief Executive Officer and Superintendent of Chicago Public Schools,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## COMPLAINT

## INTRODUCTORY STATEMENT

1.    S.J.[1] is a twelve-year-old child who is enrolled at Edward Beasley

Elementary Magnet Academic Center ("Beasley") within Chicago Public Schools

District #299 ("CPS"). S.J. is a person with disabilities. Primarily relevant to this

Complaint, S.J. is a person with Sickle Cell Disease.

2.    S.J.'s Individualized Education Program ("IEP")[2,] requires Defendants

---

[1]Pursuant to Federal Rule of Civil Procedure 5.2, S.J.'s initials are provided in lieu of her full name, as she is a minor. *See* Fed. R. Civ. Pro. 5.2(a)(3); *S.F. v. Archer Daniels Midland Co.*, 594 Fed. Appx. 11, 12 (2d Cir. 2014) (under Rule 5.2(a)(3), "only a minor's initials should be used in publicly filed documents").

[2]An IEP is the plan and legal document that lays out the special education instruction, supports and

1

to provide transportation services for S.J. because her medical condition "requires limited exposure to environmental elements (e.g. extreme temperatures, extreme pollen levels, extended exposure to the sun)." *See* Feb. 3, 2025 IEP, Section 15, attached as Exhibit 1. The IEP further defines such transportation as "from home to school and back home." *Id.*

3.     Despite that other full sized school buses regularly drive on the street immediately in front of S.J.'s home, Defendants have failed to provide the required transportation for S.J. from March 17, 2022, through the date of filing this Complaint.

4.     Defendants have, at times relevant to this Complaint, provided busing from a location approximately a block away from S.J.'s home. Transportation from this location does not comply with S.J.'s IEP. S.J. has endured health consequences, including missing school to receive consequent medical care, from attempting to use Defendants' services from this location.

5.     Therefore, S.J., through Ebonie Jude, as next friend on behalf of S.J., asks the Court to enjoin Defendants to provide S.J. with transportation "from home to school and back home," under IDEA, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973 at 29 U.S.C. § 794, *et seq.* ("Section 504"), and the Americans with Disabilities Act at 42 U.S.C. § 12131, *et seq.* ("ADA"). S.J. further asks this Court to order any available damages under 42 U.S.C. § 1983, Section 504,

---

services that a student with a disability needs in order to receive a free appropriate public education, as required by the IDEA.

the ADA, and the Illinois Civil Rights Remedies Restoration Act, 775 ILCS § 60/1 *et seq*.

## **JURISDICTION**

6.     The Court has jurisdiction over S.J.'s claims pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States); 28 U.S.C. § 1343(a)(3) (conferring jurisdiction over civil actions to redress the deprivation, under color of any state law, of any right secured by any Act of Congress providing for equal rights of citizens); the IDEA, 20 U.S.C. §§ 1415(i)(2), 1415(i)(3)(A), 1415(l); Section 504, 29 U.S.C. § 701 *et seq.*; the ADA, 42 U.S.C. § 12131, *et seq.;* and 42 U.S.C. §§ 1983-1988.

7.     This Court has supplemental jurisdiction over the Illinois Civil Rights Remedies Restoration Act in accordance with 28 U.S.C. § 1367(a)(conferring jurisdiction over state law claims to federal courts when the state claims are "so related . . . that they form part of the same case or controversy . . . .").

8.     The Court is the appropriate venue under 28 U.S.C. § 1391(b), in that the Defendants are subject to personal jurisdiction in the District, and the events giving rise to the Complaint occurred in the District.

## **PARTIES**

9.     S.J. is a twelve-year old who resides in Chicago, Illinois.

10.    S.J. is a person with Sickle Cell Disease.

11.    S.J. is a qualified individual with a disability under IDEA, Section 504, and the ADA.

12.    Defendant Chicago Board of Education, also known as Chicago Public Schools ("CPS"), is constituted within Illinois for administrative control and direction of public elementary schools in the City of Chicago, which is located in the Northern District of Illinois. CPS constitutes a "local educational agency" within the meaning of the IDEA.

13.    Defendant Macquline King, Interim Chief Executive Officer and Superintendent of CPS, is sued in her official capacity.

14.    The Defendants receive federal funds from the United States Department of Education pursuant to the IDEA for the purpose of educating children with disabilities and are responsible, *inter alia*, for ensuring that S.J. receives a free appropriate public education (FAPE) under the law. *See* 20 U.S.C. § 1401(9)(d). Since the Defendants receive federal funds, they are prohibited from discriminating against students with disabilities under Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 34 C.F.R. § 104.4.

## STATEMENT OF THE CASE

**A.     REGULATORY AND STATUTORY BACKGROUND**

### Individuals with Disabilities Education Act ("IDEA")

15.     The IDEA requires school districts receiving federal funding to provide a FAPE to eligible children identified as having disabilities. *See* 20 U.S.C. § 1400 *et seq*. The IDEA mandates that appropriate special education and related services be available for those children. *Id*.

16.     Every child who receives special education is entitled to a FAPE, which is defined, in part, as education provided in conformity with the child's IEP. 20 U.S.C. § 1401(9)(d).

17.     The IEP is a legally binding document that sets forth all the special education and related services that the school will provide to the student and establishes the annual educational goals for the student. 34 C.F.R. § 300.320(a)(4).

18.     The IEP must include the student's educational placement, which is the educational environment within which the special education instruction and services are provided.

19.     Per the IDEA, a child with a disability must be educated in a placement with their non-disabled peers to the fullest extent possible in order to ensure the disabled child is receiving FAPE. *See* 20 U.S.C. § 1412(a)(5)(A).

20.     Transportation is considered a "related service" within a student's IEP. *See* 20 U.S.C. §§ 1401(26)(A), 1414(d); 34 C.F.R. § 300.34. Transportation, including any services or supports the student would need on that transportation, such as air-

5

conditioning, a lift, an aide, a harness, or a nurse, must be included in a student's IEP if they require transportation to and from their school program to receive FAPE.

21.     Under the IDEA, every student receiving special education services must have an annual review and revision of their IEP. *See* 20 U.S.C. §§ 1401(14), 1412(a)(4), 1414(a),(d).

22.     The annual review and revision must occur no less than annually in order to determine what special education and related services are necessary for the student to receive FAPE. *See* 34 C.F.R. § 300.324; 20 U.S.C. §§ 1401(14), 1401(26).

23.      The IEP team must include at least one member with authority to bind the school district. *See* 23 Ill. Admin. Code § 226.210(d).

24.     The IDEA provides a cause of action in federal district court to challenge the contents of an IEP, following exhaustion of the administrative remedies the statute provides. *See* 20 U.S.C. § 1415(l).

25.     The requirement that administrative remedies under the IDEA be exhausted does not apply where any attempt to exhaust would be futile or inadequate. *See Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

26.     Actions to enforce an IEP do not require exhaustion of administrative remedies. Administrative hearing officers have no authority to enforce the requirements of an IEP, so attempting to enforce an IEP through administrative proceedings is futile. *See* 23 Ill. Admin. Code 226.660 (listing hearing officer's powers, which do not include enforcement powers); *Miksis v. Evanston Twp. High*

*Sch. Dist. #202*, 235 F. Supp. 3d 960, 1006-1008 (N.D. Ill. 2017) (citing numerous cases holding that exhaustion of administrative remedies is not required when the issue is only a failure to implement the IEP, and not a challenge to the contents of the IEP); *Hollenbeck v. Bd. of Educ.*, 699 F. Supp. 658, 661 (N.D. Ill 1988) ("[I]ronically, there really is no administrative mechanism to enforce compliance with a hearing officer's order.").

27.     As explained in the IDEA's legislative history, "there are certain situations in which it is not appropriate to require the exhaustion of the [IDEA's] administrative remedies before filing a civil law suit. These include complaints that . . . an agency has failed to provide services specified in the child's individualized educational program." 131 Cong. Rec. § S10396-01 (1985) (remarks of Senator Simon). According to the applicable House Report, exhaustion is not required where "it would be futile to use the due process procedures (*e.g.*, an agency has failed to provide services specified in the child's individualized educational program . . .)." H.R. Rep. 99-296, at 7 (1985) (remarks of Representative Miller).

## Section 504 of the Rehabilitation Act ("Section 504")

28.     In addition to the protections of IDEA, students with disabilities in schools that receive federal funding are protected from disability discrimination under § 504.

29.     Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability in the United States. . . shall, solely by reason of her or his disability, be excluded from participation, be denied the benefits of, or

7

be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

30.     Money damages are available under § 504 where the defendant acts with deliberate indifference to the rights of the person with a disability, which may be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood. *See Audia v. Briar Place, Ltd.*, 2018 U.S. Dist. LEXIS 68950, at \*5 (N.D. Ill. 2018).

### The Americans with Disabilities Act ("ADA")

31.     The ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. *See* 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

32.     Under the ADA, public entities must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

33.     The same "remedies, procedures and rights" set out under Section 504 apply to any person alleging discrimination on the basis of disability under Title II of the ADA. 42 U.S.C. §12133.

## The Illinois Civil Rights Remedies Restoration Act

34.     At all relevant times the Illinois Civil Rights Remedies Restoration Act, 775 ILCS 60/1, *et seq.*, was in full force and effect.

35.     Section 15 of the Civil Rights Remedies Restoration Act defines a violation of the act as a violation of Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12132, *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), or Section 1557 of the Patient Protection and Affordable Care Act (42 U.S.C. 18116). Therefore, a violation of any of the aforementioned Acts constitutes a violation of the Civil Rights Remedies Restoration Act.

36.     Any violator of the Civil Rights Remedies Restoration Act is liable for a minimum of $4,000 in damages, including but not limited to, damages for emotional pain, inconvenience, mental anguish, and any attorney's fees and costs. 775 ILCS § 60/20.

37.     Any violator of the Civil Rights Remedies Restoration Act is also liable for any injunctive relief judged appropriate. 775 ILCS § 60/25.

**B.     RELEVANT FACTS**

38.     S.J. enrolled in CPS in 2016, when she was 3-years old.

39.     S.J. is a person with Sickle Cell Disease, asthma, and food allergies. Due to her multiple disabilities, CPS provided her services through a 504 Plan.

40.     A 504 plan is generally used by school districts for students with a disability who require accommodations and support to ensure equal access to the general education environment but do not require specialized instruction.

9

41.     In 2023, at the beginning of 5th Grade, S.J. first enrolled in Beasley.

42.     Beasley is over three miles away from S.J.'s home.

43.     At the time of enrollment, S.J.'s 504 Plan required CPS to provide transportation from S.J.'s home to school and back.

44.     S.J. requires home to school transportation because physical exertion, extreme temperatures, extreme pollen levels and extended exposure to the sun can individually or in combination cause a medical crisis that requires additional medical care and often school absence.

45.     S.J.'s experience has shown that exposure to extreme temperatures, either hot or cold, is particularly likely to cause a medical crisis.

46.     Despite the home to school requirements in S.J.'s 504 Plan, CPS refused to pick S.J. up at her home. Instead, CPS asked her to wait for a bus at the corner of 30th Street and State Street, an unsheltered location about a block away from her home.

47.     When S.J.'s mother asked CPS officials why they were not picking S.J. up at her home, CPS officials claimed a full-sized school bus could not reach S.J.'s home.

48.     For the 2023-24 School Year, S.J.'s mother provided alternative transportation for S.J. because she had concerns about the impact on S.J. of walking to the exposed school bus stop.

49.     For the beginning of the 2024-25 School Year, when S.J. was in 6th Grade, S.J.'s mother found it more difficult to provide alternative transportation and S.J. expressed a strong interest in riding the bus.

50.     Around or about early September of 2024, S.J.'s mother permitted S.J. to walk to the corner of 30th and State to take the school bus to school, and to return home in the same manner.

51.     On or about September 25, 2024, because of the exertion of walking to the school bus stop and exposure to the weather, S.J. experienced a medical crisis and had to be taken to the emergency room for medical care.

52.     S.J. missed school days to receive medical care and recover from the medical crisis.

53.     S.J.'s mother continued to ask CPS to pick S.J. up at her home, but CPS continued to insist that a full-sized school bus could not reach her home.

54.     S.J.'s mother frequently observed full-sized school buses passing by her home by driving on the street where S.J. lives. S.J.'s mother alerted CPS to that reality, but CPS continued to refuse to provide door-to-door bus service for S.J.

55.     On or about January 14, 2025, S.J.'s mother allowed S.J. to take the bus from the bus stop at 30th Street and State Street.

56.     On that day, S.J.'s exertion and exposure to the weather from walking to the bus stop caused a medical crisis. S.J.'s mother had to drive S.J. to the hospital where she spent the night receiving medical care.

57.     S.J. missed school because of this medical crisis.

58.     On February 3, 2025, CPS held an IEP meeting and created an Individual Education Program for S.J.

59.     Relevant to the issue in this Complaint, one of these services included transportation to and from school with an aide. Ex. 1.

60.     The rationale recorded in the February 3, 2025 IEP for providing transportation is that "[S.J.] has a medical condition that requires limited exposure to environmental elements (e.g. extreme temperatures, extreme pollen levels, extended exposure to sun)." *Id.*

61.     The IEP further specifies that "transportation services will generally be provided from home to school and back home. Parents or caregivers of such students are to meet the bus at the curb for pick up/drop-off." *Id.*

62.     At the IEP meeting, S.J.'s mother spoke to S.J.'s Case Manager, Jennifer Walton, about the busing.

63.     Ms. Walton informed S.J.'s mother that the IEP required CPS to provide door-to-door busing.

64.     Despite the IEP, and Ms. Walton's assurances, CPS continued to refuse to pick S.J. up at her home.

65.     On or about March 17, 2025, because of exposure to cold weather caused by waiting for the bus, S.J. experienced a medical crisis early in the school day.

66.     S.J.'s school called an ambulance and the ambulance transported S.J. from school to the emergency room.

67.  Because of this medical crisis, S.J. missed school.

68.  Beginning on or about April of 2025, S.J.'s mother retained counsel to explore a resolution of this dispute. Despite multiple communications between counsel for S.J. and counsel for CPS, CPS continued to state that its Transportation Department concluded that S.J.'s home was on a dead-end street and could not be served by a full-sized bus.

69.  S.J.'s counsel provided pictures of full-sized buses driving past S.J.'s building, but without explaining the visual evidence, CPS continued to assert that full-sized buses could not use the street.

70.  Until the weather warmed up at the end of the 2024-25 School Year, S.J.'s mother continued to provide alternative transportation for S.J., usually by paying for an Uber.

71.  When mild weather returned at the end of the 2024-25 School Year, S.J. returned to using the school bus stop at 30th Street and State Street.

72.  Beginning the fall of the 2025-26 School Year, when S.J. was in 7th Grade, S.J.'s mother again permitted S.J. to walk to the school-bus stop on 30th Street and State Street.

73.  Counsel for S.J. also reached out to CPS counsel with additional photographs of full-sized buses passing by S.J.'s home. Despite this evidence, CPS continued to refuse door-to-door busing.

74.     S.J.'s street, South Federal Street in Chicago, is a two-way street. To the south of S.J.'s home, South Federal connects with 30st Street, which is also a two-way street. On the north, South Dearborn Street funnels into S.J.'s street. *See* Area Street Map, Exhibit 2.

75.     A full-sized bus can travel from 27th Street, travel south on South Dearborn Street until it funnels into South Federal Street where S.J. lives, then exit to State Street by 30th Street. *Id.*

76.     Alternatively, a full-sized bus can travel from 30th Street to South Dearborn Street (which is one way northbound at that intersection), then take South Dearborn Street to where it also funnels into South Federal where S.J. lives, then loop around to exit at 30th Street again. *Id.*

77.     Reinforcing S.J.'s need to have her disability accommodated, on or about September 24, 2025, because of S.J.'s participation in gym class, S.J. suffered another medical crisis. S.J.'s mother had to take her to an urgent care facility for medical care.

78.     Because of S.J.'s ongoing disability, S.J.'s mother will again refuse to allow S.J. to walk to and from the 30th Steet and State Street bus stop when the weather becomes cooler.

C.     **Claims for Relief**

    **COUNT I:   VIOLATION OF THE IDEA (20 U.S.C. § 1400 *et seq.*)**

79.     Paragraphs 1-78 above, and each of the paragraphs of Count II, are incorporated as if fully set forth herein.

14

80. IDEA and its implementing regulations, 34 C.F.R. Part 300, require states and local school districts that receive funds under the IDEA to provide school-age residents who have disabilities with a "free appropriate public education" (FAPE). *See* 20 U.S.C. § 1412(a)(1).

81. S.J. is a child with a disability within the meaning of the IDEA who is entitled to special education and related services. Those services are identified in S.J.'s Individualized Education Program (IEP).

82. Defendants failed and refused to comply with the IEP duly developed by her IEP team, by failing to provide transportation for S.J. to get her from home to school and back home.

83. Transportation is a substantial and significant requirement in S.J.'s IEP, one upon which her ability to attend school depends.

84. Defendants' willful failures to comply with S.J.'s IEP continue to result in S.J. being deprived of FAPE.

85. S.J. has no administrative remedies to exhaust, as she seeks only enforcement of a duly-developed IEP.

86. S.J.'s only dispute with Defendants is their willful refusal to comply with a clear requirement of that IEP, which does not require exhaustion. *See, e.g.,* H.R. Rep. 99 296, at 7 (1985).

87. Defendants refused to comply with the IEP deliberately, without valid reason, in bad faith, and with gross misjudgment.

88. Defendants willfully, intentionally, and with deliberate indifference

refused to implement the appropriate related service set forth in S.J.'s IEP, specifically transportation service to and from school.

89.     Further, Defendants deprived S.J. of her rights in egregious fashion, knowing their failure to provide transportation was likely to and would result in her physical harm, causing her to miss school, and causing her emotional distress.

90.     Defendants acted with at least deliberate indifference to the strong likelihood that a violation of S.J.'s federally-protected rights would result.

91.     Accordingly, the Defendants' actions and inaction violate S.J.'s rights under the IDEA.

92.     As a result of Defendants' conduct, S.J. has suffered and continues to suffer irreparable harm and damages, including a violation of her rights under the IDEA.

93.     S.J. seeks an order requiring Defendants to comply with S.J.'s IEP, and an order requiring them to pay attorneys' fees incurred as a result of Plaintiff having to bring this action. *See* 34 C.F.R. 300.517(a).

## COUNT II:  DEPRIVATION OF FEDERAL RIGHTS SECURED BY THE IDEA IN VIOLATION OF § 1983

94.     Paragraphs 1-78 above are incorporated as if fully set forth herein.

95.     Under the IDEA, S.J. has a clear, enforceable federal right to FAPE. *See* 20 U.S.C. § 1412(a)(1).

96.     S.J. is the intended beneficiary of the IDEA, which confers upon her, among other things, the entitlement of FAPE.

16

97.    FAPE is defined, in part, as education provided in conformity with a child's IEP. *See* 20 U.S.C. § 1401(9)(d).

98.    S.J. is deprived of FAPE where the responsible parties fail and refuse, without justification, to provide a service required by her IEP.

99.    Transportation is a substantial and significant requirement in S.J.'s IEP, one upon which her ability to attend school depends.

100.    Defendants have failed and refused to provide S.J. with a FAPE, in that they have failed and refused to comply with the requirement to provide her appropriate transportation as required by her IEP.

101.    S.J. has no administrative remedies to exhaust, as she seeks only enforcement of a duly-developed IEP.

102.    S.J.'s only dispute with Defendants is their willful refusal to comply with a requirement of that IEP, which does not require exhaustion. *See, e.g.,* H.R. Rep. 99 296, at 7 (1985);

103.    Defendants acted under color of law in depriving S.J. of her federal rights.

104.    Further, Defendants knew their failure was likely to and would result in disruption and irreparable harm to S.J.'s education, causing her to miss school, and causing extreme emotional distress to her.

105.    Defendants refused to comply with the IEP deliberately, without valid reason, in bad faith, and with gross misjudgment.

106.    Defendants acted with at least deliberate indifference to the strong

17

likelihood that a violation of S.J.'s federally-protected rights would result.

## COUNT III:  VIOLATION OF § 504 (29 U.S.C. § 794(a) *et seq.*)

107.   Paragraphs 1-78 above are incorporated as if fully set forth herein.

108.   Under § 504, students with disabilities who attend schools that receive federal funding are protected from discrimination on the basis of their disability, in those schools. *See* 29 U.S.C. § 794(a).

109.   Section 504 allows a person to seek remedies for violation of its mandates to a "person aggrieved" by violation of its provisions. 29 U.S.C. § 794a(2).

110.   Money damages are available under § 504 in cases of intentional discrimination. *See* 29 U.S.C. § 794a(a)(2).

111.   Intentional discrimination may be found where the defendant acts with deliberate indifference to the rights of the person with a disability, which may be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood.

112.   S.J.'s multiple disabilities and the impact they have on her functioning qualify her as a person with a disability under § 504.

113.   The Defendants violated S.J.'s rights and discriminated against her on the basis of disability by refusing to provide her with transportation services required by her IEP, thus denying her access to education.

114.   The Defendants also showed deliberate indifference and bad faith in their refusal to find an appropriate transportation route for S.J.

115.   Defendants acted with knowledge that a harm to S.J.'s federally

18

protected right was not only substantially likely but substantially certain, and they continued to fail to act. This constituted at least deliberate indifference to the strong likelihood that a violation of S.J.'s federally protected rights would result.

116.    As a result of Defendants' conduct, S.J. has suffered and continues to suffer irreparable harm and damages, including a violation of her rights under Section 504.

**COUNT IV: VIOLATION OF THE ADA (42 U.S.C. § 12131, *et seq.*)**

117.    Paragraphs 1-78 above are incorporated as if fully set forth herein.

118.    The ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. See 42 U.S.C. § 12132.

119.    Under the ADA, public entities must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

120.    Defendants are public entities subject to the requirements of the ADA.

121.    S.J. is a qualified individual with a disability within the meaning of the ADA.

122.    The same remedies available under Section 504 apply to discrimination claims under the ADA. 42 U.S.C. §12133. This includes damages for intentional discrimination.

123.    Intentional discrimination may be found where the defendant acts with deliberate indifference to the rights of the person with a disability, which may

19

be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood.

124. The Defendants discriminated against S.J. on the basis of disability in that they have failed to accommodate her disability by refusing to provide her with the transportation services required in her IEP.

125. The Defendants also showed deliberate indifference and bad faith in their refusal to find an appropriate transportation route for S.J.

126. Defendants acted with knowledge that a harm to S.J.'s federally protected right was not only substantially likely but substantially certain, and they continued to fail to act. This constituted at least deliberate indifference to the strong likelihood that a violation of S.J.'s federally protected rights would result.

127. As a result of Defendants' conduct, S.J. has suffered and continues to suffer irreparable harm and damages, including a violation of her rights under the ADA.

**COUNT V: VIOLATION OF THE CIVIL RIGHTS REMEDIES RESTORATION ACT (775 ILCS § 60/15)**

128. Paragraphs 1-127 above are incorporated as if fully set forth herein.

129. Section 15 of the Civil Rights Remedies Restoration Act states that the Civil Rights Remedies Restoration Act is violated when there is a violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). *See* 775 ILCS § 60/15.

130. As pled throughout, Defendant is in violation of Section 504.

131.   Section 20 of the Civil Rights Remedies Restoration Act provides for not less than $4,000 in damages per violation to encapsulate monetary losses, emotional pain, inconvenience, mental anguish, and attorney's fees and costs. *See* 775 ILCS § 60/20.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that the Court:

(a)   Enter a preliminary and permanent injunction against the Defendants, ordering them to comply immediately with S.J.'s IEP, including but not limited to providing her safe and viable transportation from her home to school and back home.

(b)   Award compensatory damages and fees under Section 504, the ADA, and the Civil Rights Remedies Restoration Act;

(c)   Award attorneys' fees, as authorized under the IDEA, Section 504, and the ADA; and

(d)   Grant such other relief as the Court deems just and proper.

DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues properly triable to a jury.

Dated: October 29, 2025

Respectfully submitted,

/s/ Charles R. Petrof
One of Plaintiff's Attorneys

Charles R. Petrof (ARDC No. 6231201)
ACCESS LIVING OF METROPOLITAN CHICAGO
115 W. Chicago Ave.
Chicago, Illinois 60654
Phone:   (312) 640-2124
Fax:        (312) 640-2139
TTY:       (312) 640-2169
cpetrof@accessliving.org